RECEIVED
FEB 05 2007
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | |
|---|---|
| RUSSELL W. SAVANT and CYNTHIA J. COMEAUX SAVANT, INDIVIDUALLY, AND ON BEHALF OF THEIR MINOR CHILDREN, COLE EURIC SAVANT, BRAD LOUIS SAVANT AND TAYLOR NICOLE SAVANT, | ACTION NO. 2:05-cv-01501-JTT-APW |
| Plaintiffs | JUDGE: TRIMBLE |
| vs. | MAG. JUDGE: WILSON |
| BERETTA U.S.A. CORP., FABBRICA d'ARMI PIETRO BERETTA S.p.A., GENE HAYDELL, AND ABC INSURANCE COMPANY, | |
| Defendants | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................. 1

II. STATEMENT OF FACTS .............................................................................................. 2

    A. Rusty Savant Was An Experienced Hunter and Long-time Firearm Enthusiast ............ 2

    B. Rusty Savant's Acquisition Of the Subject Shotgun And The
       Accompanying Instruction Manual .................................................................................. 3

    C. Rusty Savant's Awareness Of Safe Gun Handling Rules ................................................ 4

    D. The Subject Shotgun Performed Flawlessly For Savant ................................................. 4

    E. Savant's Self-Inflicted Shotgun Wound While Standing Directly In
       Front Of The Muzzle ........................................................................................................ 5

    F. Rusty Savant's Post-Accident Admissions Of Negligence ............................................ 6

III. DISCUSSION ................................................................................................................... 6

    A. Summary Judgment Standard ......................................................................................... 6

    B. "Reasonably Anticipated Use" - A Threshold Issue For Any Claim Under
       The Louisiana Products Liability Act ............................................................................. 7

    C. Plaintiffs' Claims Are Barred Because They Do Not Arise Out Of
       A Reasonably Anticipated Use Of The Beretta Shotgun ............................................. 10

IV. CONCLUSION .............................................................................................................. 14

## TABLE OF AUTHORITIES

Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 7

*Broussard v. Procter & Gamble Co.*, 2006 U.S. Dist. LEXIS 85270
(W.D.La. 2006) ............................................................................................................................ 8, 13

*Carter v. Louisville Ladder Group, LLC*, 2005 U.S. Dist. LEXIS 30317
(W.D.La 2005) ............................................................................................................................. 8, 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 6, 7

*Daigle v. Audi of America, Inc.*, 598 So.2d 1304 (La. App. 3rd Cir. 1992) .................................... 8

*Delphen v. The Dep't of Transp. and Dev., State of Louisiana*, 657, So.2d 328
(La. App. Ct. 1995) .............................................................................................................. 8, 12, 14

*Frith v. John Deere Co.*, 955 F.Supp. 663 (W.D. La. 1996) ........................................... 9, 11, 12, 14

*Hunter ex rel. Hunter v. Knoll Rig & Equip. Mfg. Co.*, 70 F.3d 803 (5th Cir. 1995) ........... (passim)

*Kampen v. American Isuzu Motors, Inc.*, 157 F.3d 306 (5th Cir. 1998) .............................. 7, 8, 10

*Lavespere v. Niagra Mach. & Tool Works, Inc.* 910 F.2d 167 (5th Cir. 1990) ............................. 7

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ................................................................ 7

*Lockart v. Kobe Steel Ltd. Const. Mach. Div.*, 989 F.2d 864 (5th Cir. 1983) ........................... 9, 10

*London v. MAC Corp. of Amer.*, 44 F.3d 316 (5th Cir. 1995) .......................................... 8, 11, 14

*Myers v. American Seating Co.*, 637 So.2d 771 (La. App. 1st Cir. 1994) ............................. 12, 13

Statutes

Fed. R. Civ. P. 56 ........................................................................................................................ 6, 7

La. R.S. § 9:2800.53 ......................................................................................................................... 8

La. R.S. § 9:2800.54 ........................................................................................................... 2, 7, 8, 10

## I. INTRODUCTION

In this product liability action, plaintiff Russell "Rusty" Savant and his family seek to recover damages arising out of an October 5, 2004 accidental shooting in which Savant shot himself in the groin at point blank range as he sought to reach in and retrieve his loaded Beretta Model A390 12 gauge shotgun from the back seat of his pick-up truck while knowingly and deliberately standing directly in front of the shotgun's barrel. Despite admissions to several bystanders and first-responders that he was in the act of *pulling* the shotgun from the truck when it discharged, Savant now claims that he merely "touched" the barrel of the shotgun as he began the process of pulling it from the back seat area causing it to mysteriously fire.[1] The pellets from the discharged shell entered Savant's lower right groin area, causing serious and permanent injuries.

Plaintiffs include Savant (hereinafter "Rusty Savant" or "Savant"), his wife and their three minor children. They have named as defendants Fabbrica d'Armi Pietro Beretta S.p.A. (the shotgun's Italian designer and manufacturer), Beretta U.S.A. Corp. (its United States importer and distributor), and their insurer, Assicurazioni Generali, S.p.A., in various claims arising under the Louisiana Products Liability Act (hereinafter "LPLA" or "the Act").

Despite the obvious factual dispute between Rusty Savant's initial admissions and his contentions now in this action, defendants nonetheless move for summary judgment because there is no genuine issue as to any material fact that plaintiffs' damages do not arise out of a

---

[1] The main factual dispute in this case is whether the shotgun mysteriously discharged, as Savant claims, when he merely "touched" the barrel to remove the firearm as it lay on the rear seat of his pick-up truck – after having used it extensively over three hunting seasons "without a second's trouble" – or whether the discharge was the result of Savant "pulling" the shotgun out of the truck – as he admitted to several witnesses in the moments immediately after the accident – thereby causing an inadvertent movement of the trigger. For purposes of the discrete issue raised by this motion, however, this factual dispute is not material.

"reasonably anticipated use" of the subject shotgun; thus, they are unable to prove an essential element of their LPLA claims under Section 9:2800.54 (claimant under the Act must show his damages arose from a reasonably anticipate use of the product). As is set forth in detail below, there simply is no disputed material fact on this issue. Accordingly, defendants are entitled to summary judgment as a matter of law.

## II. STATEMENT OF FACTS

### A. Rusty Savant Was An Experienced Hunter And Long-time Firearm Enthusiast

Plaintiff Rusty Savant was 35 years old when the incident occurred; he has been hunting since he was 5 years old. *See*, Statement of Undisputed Facts [hereinafter "SUF"] No. 1. He participated in firearm safety courses while in school and became very knowledgeable about firearms and their safe handling in the 30 or so years of hunting and recreational shooting before his accident. SUF No. 2. Savant is an experienced hunter in the truest sense, and he is an avid gun enthusiast and collector. Indeed, at the time of his accident in October 2004, Savant owned or had owned nearly twenty (20) different firearms including revolvers, pistols, bolt-action rifles, and shotguns of all shapes and sizes.[2] SUF No. 3.

---

[2] Among the many firearms Savant owned on the date of the accident were: (1) Remington Model 1100 12 gauge shotgun; (2) Mossberg pump action shotgun, (3) Browning lever-action .22 cal. rifle; (4) Ruger .22 cal. pistol; (5) Model 700 .223 rifle; (6) two 12-gauge double barrel shotguns; (7) a 7.62-by-54 rifle; (8) Remington .22 magnum semi-automatic rifle; (9) Taurus .357 magnum revolver; (10) CVA .50-caliber black powder muzzleloader; (11) Marlin "Long Tom" 12-gauge shotgun; (12) Remington Model 11 20 gauge shotgun; (13) Rossi SA .410 shotgun; (14) Pardner (youth model) .410 shotgun; (15) Cameo Hunter 220 rifle; (16) Hunter Arms Fulton 12 gauge shotgun; (17) Cricket-Keystone Sporting Arms .22-caliber rifle; (18) Remington Model 1100 20-gauge shotgun; (19) Remignton Model 870 12-gauge shotgun, and; (20) Beretta Model A390 Silver Mallard 12-gauge shotgun. SUF No. 3.

2

### B.   Rusty Savant's Acquisition Of The Subject Shotgun And The Accompanying Instruction Manual

Savant received the subject Beretta Model A390 semi-automatic shotgun new as a Christmas gift from his wife in December 2001. SUF No. 4. Thereafter, he used it as his primary hunting shotgun for nearly three years until the accident. SUF No. 5. The subject shotgun was accompanied by a manual entitled, "Instructions for operation," which Savant read in its entirety once on Christmas day and perhaps one or two other times over the next two or three days. SUF No. 6. This instruction manual contained the following explicit safety information and warnings:

> "**Caution**: read this manual carefully before handling and loading the gun.
>
> **THE COMMANDMENTS OF GUN SAFETY**
>
> 1) <u>Treat every gun with respect and caution.</u>
>
> 2) <u>Keep your eyes on the muzzle. Keep safety on until ready to shoot.</u>
>
> 3) <u>Unload guns when not in use; keep the actions open.</u>
>
> 4) Be sure the barrel is clear of obstructions.
>
> 5) Be certain of the target at which you are going to fire. Know how to recognize the game you are hunting.
>
> 6) Never shoot at a flat surface.
>
> 7) Never climb a tree or fence or jump a ditch with a loaded gun. <u>Don't take a gun by the barrel</u>.
>
> 8) <u>Never point a gun at anything you don't want to shoot. Avoid all horseplay while handling a gun.</u>
>
> 9) <u>Store guns and ammunition separately, beyond the reach of children. Guns should always be unloaded.</u>

3

10) Avoid alcoholic beverages before or during shooting.

SUF No. 7 (emphasis added).

### C. Rusty Savant's Awareness Of Safe Gun Handling Rules

In addition to the warnings in the Berretta manual, Savant concedes he aware of similar warnings set forth in the manual for another of his firearms – his Ruger .22 caliber pistol – including the following: (1) "Always keep the muzzle pointed in a safe direction," (2) "Firearms should be unloaded when not in use," and (3) "Never transport a loaded firearm." SUF No. 8.

More importantly, however, Savant admits he has long been aware of the common sense safe firearms handling rule of always keeping the muzzle of a gun pointed in a safe direction; indeed, that was a gun handling rule he has taught his own sons. SUF No. 9. Yet, when asked in deposition how, if at all, he complied with this common sense rule just before his accident, Savant simply responded: "I don't know." SUF No. 10.

Further, although he was well aware of and agreed with another common sense gun safety rule – unloading a firearm when not in use – Savant claims he did not violate this rule because the loaded Berretta shotgun in his truck was "in use" as a "farm tool." SUF No. 11.

### D. The Subject Shotgun Performed Flawlessly For Savant

Savant has acknowledged that prior to his October 2004 accident the subject shotgun "worked perfectly." SUF No. 12. Indeed, he has conceded that he "never had a second's trouble with [it]." *Id.* Even more directly, Savant has allowed that the subject shotgun is "a damn good gun," and that he had "[n]o trouble whatsoever" with it. *Id.* That is to say that Savant never experienced a failure to eject a shell, a failure to feed a shell, a misfire, a drop-fire, or a slam-fire. *Id.*

4

During the almost three (3) years he used the subject shotgun as his primary hunting shotgun prior to the accident, Savant never observed anything about its performance which would have suggested to him that something was wrong with it. SUF No. 13. In fact, between Christmas 2001 and his October 5, 2004, accident, Savant estimates he shot at least 2.5 *cases* of shells (250 shells in each case) per year with the Beretta shotgun. Thus, by his own admission Savant shot about 1,875 shells through the subject shotgun without incident. (7.5 cases x 250 shells per case). SUF No. 14.

### E. Savant's Self-Inflicted Shotgun Wound While Standing Directly In Front Of The Muzzle

On the day of his accident, Savant was preparing to go dove hunting on his farm with his then seven year-old son, Brad. Both Savant's Beretta shotgun and his son's .410 gauge shotgun were located in Savant's Chevrolet 2500 HD extended cab pick-up truck parked near the Savant house. He went to retrieve the guns from the pickup by himself. At the time, the subject shotgun was laying on the back seat of the cab, with the muzzle pointing directly at the rear passenger side door. SUF No. 15.[3] Although Savant has admitted he knew at the time that the muzzle of any firearm should always be kept pointed in a safe direction, he nonetheless chose to go to the passenger side of the truck (rather than the driver's side) to retrieve the subject shotgun. SUF No. 16.

Savant reached into the back seat area of the pickup truck with the intent to pick the Berretta shotgun up by the barrel – despite his awareness that the shotgun was still fully

---

[3] Exhibit 5 to Rusty Savant's September 14, 2005 interview under oath [Livingston Aff., Exh. A] cited in support of SUF No. 15 is a photograph of the back seat area of Savant's truck taken during a "reenactment" arranged by his counsel. This photograph, taken from the driver's side of the pick-up truck, shows Savant's body position – directly in front of the shotgun's muzzle – at the moment he reached in to grab it on the day of accident. SUF No. 15.

5

loaded – and pull it towards him and out of the truck. SUF 17. As he began to do so, Savant claims the shotgun discharged "instantly" as soon as he merely "touched" the barrel. SUF 18.

### F. Rusty Savant's Post-Accident Admissions Of Negligence

Savant has acknowledged that standing in front the muzzle of the subject shotgun was a "dumb" thing to do. SUF No. 19.[4] Further, within minutes of the accident, he told his cousin, Wade Savant (one of the first persons on the scene): "I messed up, man! I really messed up!" SUF No. 20.

Finally, while receiving first aid from neighbor Corrie Roberts, another person immediately on the scene, Savant repeatedly told Roberts, "This is so stupid. I can't believe how stupid that was." SUF No. 21.

### III. DISCUSSION

### A. Summary Judgment Standard

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56*. Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When the non-moving party has the burden of proof on an issue at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Celotex Corp. v. Catrett, 477 U.S. 317 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. If the moving party is successful, the burden shifts to the non-moving party to show there is a genuine

---

[4] In his September 14, 2005 interview under oath, Savant candidly conceded the stupidity of what he had allowed to happen to him: "Q: What do you mean, you didn't believe you had done what you had done? A: Just the – I realized that that was a dumb thing that I had just let happen to me. Q: Dumb in the sense that you stood in front of the muzzle? A: Yes." SUF No. 19 [Savant interview under oath at pp. 67:15-68:1].

6

issue of material fact, and the respondent must then direct the attention of the court to evidence in the record setting forth specific facts sufficient to establish the necessity of a trial. *Id. at 322-24.*

The respondent may not rest on mere allegations to establish a genuine issue worthy of a trial, but must instead demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc).* There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Lavespere v. Niagra Mach. & Tool Works, Inc. 910 F.2d 167, 178 (5th Cir. 1990).* If no issue of fact is presented, the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

**B.      "Reasonably Anticipated Use" – A Threshold Issue For Any Claim Under The Louisiana Products Liability Act**

The LPLA "provides the exclusive theories of liability for manufacturers for damage caused by their products under Louisiana law." *Kampen v. American Isuzu Motors, Inc., 157 F.3d 306, 309 (5th Cir. 1998).*

To recover under *any* theory of liability under the LPLA, plaintiffs must first show that their damages: (1) were proximately caused by the characteristic of the product that renders it unreasonably dangerous, and (2) arose from "a reasonably anticipated use of the product . . . ." *La. R.S. § 9:2800.54(A); Kampen, supra, 157 F.3d at 309.* However, the courts have concluded that the "reasonably anticipated use" question is the "threshold matter" for consideration; thus, "[i]f a plaintiff's damages did not arise from a reasonably anticipated use of the product, then the "unreasonably dangerous" question need not be reached." *Kampen, supra, 157 F.3d at*

7

*309; Broussard v. Procter & Gamble Co., 2006 U.S. Dist. LEXIS 85270, \*12 (W.D.La. 2006); Carter v. Louisville Ladder Group, LLC, 2005 U.S. Dist. LEXIS 30317, \*3 (W.D.La 2005).*

"Reasonably anticipated use" under the LPLA is defined as a "use *or handling* of the product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." *La. R.S. § 9:2800.53(7)(emphasis added).* Plaintiffs have the burden of showing that the damage arose from a reasonably anticipated use. *La. R.S. § 9:2800.54(D).* "The standard for reasonably anticipated use is objective and is made from the standpoint of the manufacturer at the time the product was produced." *Broussard, supra, 2006 U. S. Dist. LEXIS 85270 at \*14.* Moreover, "reasonably anticipated use" is a more restrictive phrase than pre-LPLA phrase "normal use," and it does not suggest liability for a manufacturer for every conceivable, foreseeable use of its product, nor does it "encompass misuses in direct contravention of a warning or where the danger should have been obvious to the experienced as well as the ordinary, consumer." *Delphen v. The Dep't of Transp. and Dev., State of Louisiana, 657, So.2d 328, 333 (La. App. Ct. 1995); London v. MAC Corp. of Amer., 44 F.3d 316, 318-319 (5th Cir. 1995); Kampen, supra, 157 F.3d at 309-312; Broussard, supra, 2006 U. S. Dist. LEXIS 85270 at \*15.* "In sum, the LPLA imposes manufacturer liability only if the accident occurred during a reasonably *anticipated* (manufacturer should have reasonably expected) use, not a reasonably *foreseeable* use or misuse." *Hunter ex rel. Hunter v. Knoll Rig & Equip. Mfg. Co., 70 F.3d 803, 810 (5th Cir. 1995) citing Daigle v. Audi of America, Inc., 598 So.2d 1304, 1307 (La. App. 3rd Cir. 1992) (emphasis in original).*

In addressing the "reasonably anticipated use" question, courts have looked to such factors as: (1) whether the injured party used the product in a manner that was obviously dangerous; (2) what the user was instructed to do and warned not to do with respect to the use of

8

the product; (3) whether the use of the product was expressly warned against in the product's labeling (or operations manual) and the language of that warning; and (4) the sophistication/experience of the user-purchaser. *Hunter, supra,* 70 F.3d at 806; *Lockart v. Kobe Steel Ltd. Const. Mach. Div.,* 989 F.2d 864, 866 (5th Cir. 1983); *Frith v. John Deere Co.,* 955 F.Supp. 663 (W.D. La. 1996), aff'd 108 F.3d 332 (5th Cir. 1997). These factors are not interdependent, but are independent and alternative grounds to find the use or handling of a product was not reasonably anticipated. For example, this Court previously held: "Even if an express [warning][5] does not reach a consumer, reasonably anticipated use will not be found where the danger should have been obvious to the experienced consumer as well as the ordinary consumer." *Frith,* 955 F.Supp. at 666.

As is evident from the undisputed facts concerning Rusty Savant's extensive experience with firearms, his appreciation of the obvious dangers of grabbing a shotgun he knew to be loaded by the barrel while standing directly in front of its muzzle, and the express warnings in the subject shotgun's instruction manual, ["Keep your eyes on the muzzle"; "Don't take a gun by the barrel"; "Guns should always be unloaded."], the relevant warnings in his Ruger manual, ["Always keep the muzzle pointed in a safe direction."], each of these factors cuts in favor of finding that his use of the subject shotgun at the time of the discharge was *not* a reasonably anticipated use.

Accordingly, summary judgment is proper for the moving parties.

---

[5] The opinion inadvertently uses the word "warranty" instead of "warning", but it is clear from the opinion's recitation of the facts and discussion that the Court intended to use the word "warning."

### C. Plaintiffs' Claims Are Barred Because They Do Not Arise Out Of A Reasonably Anticipated Use Of The Beretta Shotgun

As set forth above, to state a claim under LPLA plaintiffs must first establish that their "damage arose from a reasonably anticipated use of the product . . . ." *La. R.S. § 9:2800.54(A) and (D)*. Fortunately, both state courts and federal courts sitting in diversity have provided some guidance as to what will and will not be considered "reasonably anticipated use." For example, in *Lockart, supra,* plaintiffs used an excavator to suspend a pontoon they were attempting to repair. *989 F.2d at 865*. The chain used to suspend the pontoon from the teeth of the excavator's bucket slipped off the pontoon and fell on plaintiffs. *Id.* Because the operator's manual warned against lifting a load with the bucket teeth, the court found that it was not a reasonably anticipated use.[6] *Id. at 866-867*. Alternatively, the court held that the use was not reasonably anticipated because the danger of using the excavator as plaintiffs did "should have been obvious to the ordinary consumer and certainly to experienced workers" such as plaintiffs, who had years of experience with this type of equipment and had taken company sponsored classes regarding equipment handling. *Id. at 868*.

In *Hunter*, the decedent was on the drilling rig racking board attached to a drilling rigs mast, which was in a vertical position. *70 F.3d at 804*. A modified latch on the handrail failed, causing the decedent to be crushed by the pipes then being racked. *Id. at 804-805*. Normally the pipes are loaded so that they are positioned against the back frame of the racking board creating a positive lean. If the pipes are loaded with negative lean – leaning

---

[6] The court also notes that the warning may not have reached the plaintiffs, but this is immaterial to the court's decision regarding whether the use was reasonably anticipated. *See Kampen, 157 F.3d at 313* ["*Lockart* held that the use of the excavator was not reasonably anticipated for two, alternative reasons: (1) because an adequate warning was provided ... and (2) because even if the decedents had not knowledge of that warning, the danger ... should have been obvious."].

10

toward the mast – it is dangerous. *Id. at 805*. At the time decedent was crushed, the pipes were being loaded in a manner that eventually created a negative lean causing the latches to fails and the pipes to fall toward the mast crushing decedent. *Id.*

The issue before the Fifth Circuit Court of Appeal was whether the decedent had *handled* the drilling rig racking board in a manner that was reasonably anticipated at the time of his death. The court held it "was not being handled in a reasonably anticipated manner at the time of the accident." *70 F.3d at 804, 808*. It first noted that the definition of reasonably anticipated use includes "use or *handling*." *Id. at 806* [emphasis in original]. It then found that while the manufacturer was aware of the possibility of the creation of negative lean when pipes are loaded as decedent and his co-workers were loading them, the decedent and his co-worker were also aware of the potential for negative lean and the industry practice for correcting negative lean before it becomes dangerous. *Id. at 808-809*. Thus, "the lean at the time of the accident was obviously dangerous." *Id. at 810*. Accordingly, the court held the manner of handling was not a reasonably anticipated use of the drilling rig racking board. *Id.* As such, plaintiffs' claims were barred. *Id. at 806, n. 3*.

In *London*, the plaintiff, a trained employee, stood on the gearbox of a shredder to unclog it when he fell and was injured. *44 F.3d at 317*. The court affirmed the trial court's directed verdict, finding that "although London's use of the gear box cover as a work station may be conceivable," it was not reasonably anticipated. *Id. at 319*.

In *Firth*, plaintiff was injured when his tractor was "by-passed" started and hit him while he was standing in front it. The issue before this Court was whether it was reasonably anticipated that the tractor would be "by-passed" started. *955 F.Supp. at 664*. Plaintiff acknowledged his awareness prior to the accident of the danger associated with by-pass

11

starting a tractor and had read warnings in this regard on other tractors. *Id. at 666.* Nonetheless, plaintiff argued that farmers would still by-pass start tractors despite efforts by manufacturers to stop this conduct. This Court, however, found plaintiff's injuries were caused by a misuse of the tractor. *Id.* The Court held that by-pass starting was not a reasonably anticipated use of the tractor under the LPLA, because of (1) the express warnings, and (2) the "danger was obvious to [plaintiff and his farmhand] as both ordinary and experienced users." *Id.*

In *Delphen*, the plaintiff was injured when he was thrown from a ten-speed racing bike he borrowed from a friend. *657 So.2d at 331.* The bicycle used extensively by its owner for competitive racing and recreation. *Id. at 333.* For racing purposes, the bicycle was equipped with a quick release system for the front wheel. *Id.* Plaintiff attempted to adjust the quick release prior to the accident, but acknowledged he was unfamiliar with the operation of the quick release mechanism. *Id.* Plaintiff, nonetheless, argued the quick release on the front wheel allowed the tire to come loose when he crossed over a movable swing span joint on the bridge and sued the bicycle manufacture, retailer, manufacturer of the quick release device, and department of transportation. *Id. at 331, 333.* The court found that while the danger would have been obvious to reasonable person who acknowledged that the bicycle specialized for a sophisticated user, an ordinary person should determine how the quick release worked before using the bicycle. *Id. at 334.* Thus, it held plaintiff's use was not reasonably anticipated because of the obvious danger associated with using the specialized bicycle. *Id.*

Finally, in *Myers v. American Seating Co., 637 So.2d 771 (La. App. 1st Cir. 1994)*, plaintiff stood on the rear of a folding chair in order to place items on a ledge when it collapsed. *Id. at p. 772.* Plaintiff acknowledged "she knew the chair was a folding chair and

12

... that she 'definitely was wrong by standing on the chair.'" *Id. at 776.* She also acknowledged a stepladder was available to use instead of the chair. *Id.* Accordingly, the court held that while it was *conceivable* a person might do what plaintiff did, her use of the folding chair still was not a reasonably anticipated use because the danger of standing on the rear of the chair was an "obvious danger." *Id. at 779.*[7]

Here, Savant is and was at all relevant times an experienced and knowledgeable user of firearms. He had taken firearm safety courses and had 30 years of hunting experience. He had an extensive gun collection with twenty (20) different handguns, shotguns and rifles. SUF Nos. 1-3. He read the Beretta manual a number of times, including the explicit warnings regarding keeping an eye on the muzzle, never taking a firearm by the barrel, never pointing the firearm at anything the user does not want to shoot, and never keeping a gun loaded when not in use. SUF Nos. 6-7. He also was aware of similar warnings in the manual for his .22 caliber Ruger, including: "Always keep the muzzle pointed in a safe direction." SUF No. 8. Thus, Savant acknowledges that at the time he went to retrieve the Beretta firearm on the day of the accident, he knew *the muzzle of a firearm should always be kept pointed in a safe direction.* SUF No. 9. Indeed, this was a safe gun handling rule he was "driving home" to his own sons. SUF No. 9.

---

[7] In *Broussard, supra,* the court held that plaintiff's use of a ThermaCare Heat wrap, which she placed directly against the skin of her low back and fell asleep thereby causing third degree burns, was not a reasonably anticipated use. In so holding, Judge Melançon considered plaintiffs' use of the wrap in direct contravention of express warnings for persons with her medical condition. *Broussard, supra,* 2006 U.S. Dist. LEXIS 85270, *18-22. Summary judgment was therefore granted for defendant. Similarly, in *Carter, supra,* summary judgment was granted for defendant ladder manufacturer in a case involving a fall from a 20-foot extension ladder. There, plaintiff positioned a ladder at about a 59 degree angle to the house he was working on (rather than the recommended 75.5 degree angle), with the ladder feet on a sloped, grassy area. *2005 U.S. Dist. LEXIS 30317,* *1-2. In finding that plaintiff's use was not reasonably anticipated, Judge Drell relied heavily on plaintiff's disregard for several clear and unambiguous instructions on the ladder's use. *Id. at* *17-18.*

13

Yet, notwithstanding Savant's long experience with firearms and his awareness of the explicit warnings and common sense gun safety rules, as well as the obvious risk associated with what he was about to do, he attempted to retrieve the Beretta shotgun—which he knew to be loaded—by reaching for its barrel while standing *directly in front of the muzzle*. SUF Nos. 15-17. Moreover, immediately after he was shot, he appreciated the stupidity of his own conduct and expressed this to those immediately on scene. SUF Nos. 19-21.

As an experienced, long-time user and collector of firearms, who read and understood the explicit warnings Beretta provided, Savant nonetheless chose to handle the subject shotgun in a manner that was obviously dangerous and in direct contravention of Beretta's warnings, not to mention in violation of well-known, common-sense safe gun handling rules. SUF Nos. 1-3, 6-9, 15-17. Accordingly, Savant did not use or *handle* the Beretta shotgun in a reasonably anticipated manner. *See, Hunter,* 70 F.3d at 810; *Lockart,* 989 F.2d at 866-868; *Frith,* 955 F.Supp. at 666-668; *Delphen,* 657 So.2d at 334. Plaintiffs' claims should therefore be barred and summary judgment should be granted in favor of the moving defendants.

## IV. CONCLUSION

Savant's handling of the Beretta firearm was not a "reasonably anticipated use" under the Act. To the contrary, standing directly in front of—indeed within inches of—the muzzle of a shotgun he knew to be loaded, as he began to pull it from his truck, was not something Beretta would anticipate from any user, much less one with Savant's length and breadth of firearms and handling experience.

For all the foregoing reasons, Defendants respectfully request the Court grant their motion for summary judgment.

Respectfully submitted,

By: *[signature]*
Craig A. Livingston, (Cal. Bar # 148551)
LIVINGSTON LAW FIRM, P.C.
1600 South Main Street, Suite 280
Walnut Creek, CA 94596
(925) 952-9880 (telephone)
(925) 952-9881 (facsimile)

And

Howard Daigle, Jr. (T.A.) (Bar #4454)
DAIGLE FISSE, PLC
227 Highway Twenty-One
Madisonville, Louisiana 70447
(985) 871-0800 (telephone)
(985) 871-0899 (facsimile)

## CERTIFICATE OF SERVICE

I do hereby certify that on this 2nd day of February 2007, I have served a copy of the foregoing pleading on counsel for all parties to this proceeding, by mailing the same by United States mail, properly addressed, and first class postage prepaid.

*[signature: Carine Darrow]*

15

# LIVINGSTON LAW FIRM
A PROFESSIONAL CORPORATION

February 2, 2007

*Via Overnight Federal Express Delivery*

USDC-Western District of Louisiana
Clerk's Office
United States Courthouse
800 Lafayette Street, Suite 2100
Lafayette, Louisiana 70501

    RE:    *Savant v. Beretta U.S.A. Corp., et al.*
              USDC-Western Dist. of Louisiana Case No. 05cv-01501-JTT-APW

Dear Clerk:

    Enclosed for filing please find original and one copy of the following documents in the above-referenced action: 1) Defendants' Motion for Summary Judgment; 2) Affidavit of Craig A. Livingston in Support of Defendants' Motion for Summary Judgment and 3) Separate Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment.

    Please file the original documents and return endorsed-filed copies in the enclosed self-addressed, stamped envelope. Please be advised we are sending Judge Trimble a courtesy copy of the enclosed documents also via overnight delivery.

    Should you have any questions regarding the above, please contact our office. Thank you for your assistance in this matter.

                                         Very truly yours,

                                         LIVINGSTON LAW FIRM

                                         Corine Darrow
                                         Legal Assistant to Craig A. Livingston

CAL/ctd
Enclosure
cc:    Judge James T. Trimble, Jr. (w/enclosures)
        Lake Charles Division